[Civ. No. 3541. Fourth Dist. Mar. 25, 1947.]

Estate of JOHN HUNTER COLLINS, Deceased. JACK ESTABUENO NELSON, Appellant, v. VIRGINIA T. WHITE et al., Respondents.

Frederick E. Hoar for Appellant.

Dorsey & Campbell and Wagy & Hulsy for Respondents.

BARNARD, P. J.—This is a proceeding to determine heirship. John Hunter Collins died intestate on October 13, 1943, leaving no surviving spouse. He had lived in Bakersfield since 1910. Most of that time he was married to Hannah Dodson Collins. They separated in 1938, and she died at an earlier date in 1943. According to a certified copy of a marriage certificate introduced in evidence the deceased had previously married one Minnie Jefferson at Galveston, Texas, on October 1, 1900.

The appellant, claiming to be the sole and legitimate issue of the marriage last referred to, filed a petition in the estate of the deceased to establish his heirship and his right to receive the whole of the estate. He alleged that he was born at Bryan, Texas, on July 11, 1905, as the lawful issue of the deceased and the Minnie Collins who were married in Galveston on October 1, 1900. This petition was opposed by the brothers and sisters of the deceased, and also by two children of Hannah Dodson Collins by a former marriage. The respective claims of heirship were tried before the court without a jury. The respondents made no effort to prove the parentage of the appellant but rely upon their contention that he is not the child of the deceased. The trial was largely upon issues of identity as to whether the Minnie Collins whom the deceased apparently married on October 1, 1900, was the same person as the Mittie Collins who was the mother of the appellant, and whether the deceased was the same John Collins as the one who had apparently married the mother of the appellant. The court entered an order that the appellant take nothing and later made findings and entered judgment to

the effect that he was not an heir at law of the deceased, and that the deceased died without issue. This appeal followed.

Some things appear in the evidence with little or no conflict. The mother of appellant was commonly known to her family and friends as "Mittie" Jefferson, and later as Mittie Collins, although there is evidence that she was sometimes called "Minnie." She was raised at Bryan, Texas, and later lived for a time in Galveston. The date she left Bryan for Galveston does not appear. There is evidence that in Galveston she lived for a time, as husband and wife, with a man named John Collins, who was employed as a longshoreman foreman; that sometime in 1905, she gave birth to a son, who is the appellant; that this John Collins deserted her when the son was about a year old; that she returned to Bryan, Texas, when the appellant was about a year and a half old; that she was then in poor health; that she then lived with a Mr. and Mrs. Nelson, Mrs. Nelson being her cousin; that she died of tuberculosis about a year after she returned to Bryan; that Mr. and Mrs. Nelson raised the appellant although they never adopted him; that the John Collins who was supposedly married to appellant's mother was never known to have been in Bryan, or to have communicated with her, after she returned there; and that the appellant lived with the Nelsons until after he was grown.

On September 2, 1943, for the purpose of obtaining employment as a Pullman porter, the appellant secured the entry of a delayed certificate of birth in the county in which Bryan, Texas, is located. In this certificate the county judge certifies that the truth of the statements therein contained was established to his satisfaction, as required by statute. This certificate gives the appellant's name as Jack Estabueno Collins and recites that he was born on July 11, 1905; that his father, John Collins, was then a resident of Bryan, Texas, was 24 years old, was a farmer and was born at Calvert, Texas; that his mother's maiden name was Mittie Jefferson; that at the time of the birth she resided in Bryan, Texas; that she was a housewife; that she had herself been born in Bryan, Texas; and that his father and mother were negroes. The certificate has attached to it two affidavits of persons who swear that these facts are true and that they were acquainted with the facts at the time of the event. On January 10, 1944, the appellant secured a decree of a Texas court changing his name to Jack Estabueno Nelson. Shortly thereafter, having, as

he said, learned that John Collins had come to California and might be residing at Bakersfield, he came to Bakersfield to see him. He then learned for the first time that this John Collins was dead.

It also appears that the deceased, who was born in Alabama in 1876, was 29 years old in 1905, when the appellant was born, and lived in Galveston from 1900 to 1904; that he came to California in September or October, 1904, his father, mother, brothers and sisters having previously come to this state. He resided for a time in San Diego, in Los Angeles and in or near San Francisco, and finally settled in Bakersfield about 1910. The evidence indicates that he resided in California continuously from September, 1904, until his death. Although it is not conclusively shown that he did not return to Galveston during the year 1905, there is no affirmative evidence that he did. It also appears that after Hannah Dodson Collins left the deceased in 1938, he lived for the five years preceding his death with a woman named Diana Smallwood, without benefit of clergy.

▪ Appellant's main contention is that the finding that he is not the son of the deceased is unsupported by, and is contrary to, the evidence. It is argued that the uncontradicted evidence proves the marriage between the deceased and "Minnie" or "Mittie" Jefferson, a cohabitation between them subsequent to such marriage, and that the appellant was the child of this union. It is further argued that the evidence to the effect that the deceased was not the father of the appellant is insufficient to overcome the statutory presumption of legitimacy, and that the parenthood of the deceased was affirmatively established by the delayed birth certificate which was introduced by the respondents. While the uncontradicted evidence shows a marriage between the deceased and a "Minnie" Jefferson in 1900, and that the deceased lived with that woman as his wife for a year or two in Galveston, and while it also shows that the appellant was the son of a "Mittie" Jefferson, who was sometimes called "Minnie," the evidence is conflicting as to the identity of these women or as to whether the mother of the appellant was the one that married the deceased in 1900. The question is, and was, entirely one of identity and no question with respect to the presumption of legitimacy is involved.

The appellant introduced in evidence six letters written by the deceased's brother, Lawson Collins, to the woman the de-

ceased married in 1900, and two letters written to her by the father and mother of the deceased. These letters were all dated between September 13, 1901, and December 15, 1902. He also introduced two letters written to this woman by the deceased, both dated in February, 1901. The appellant testified that he found these letters tied in a bundle in an old trunk belonging to his foster mother, Mrs. Nelson, and that this occurred after he visited Bakersfield. While this evidence, if true, would tend to connect the mother of the appellant with the woman married by the deceased in 1900, the value and effect of this evidence is seriously affected by other evidence to the effect that these letters were in the possession of the deceased at the time of his death.

Lawson Collins testified that he visited the deceased and his wife "Minnie" for a week in 1901, and spent several months with them in the summer of 1902, that they then lived at 2312 Winnie Street in Galveston, and that he wrote the above mentioned letters to the woman his brother had introduced as his wife. Jerome Collins, another brother of the deceased, testified that he visited the deceased and his wife "Minnie" at the same address in Galveston in 1902. Diana Smallwood testified that while she was living with the deceased he told her that he had a wife before Hannah called Minnie or Mittie; that he married her in Galveston; that they had a baby; that he didn't say whether it was a boy or girl; and that he left this wife and baby when he came to California. A half brother of the appellant's mother testified that she returned to Bryan with a child a year or a year and a half old, which child is the appellant; that she told him she had married a man named John Collins, but he left her while in Galveston; and that his sister's husband was never seen in Bryan. Three witnesses testified to the same effect, that appellant was brought to Bryan when he was a year or a year and a half old by his mother "Mittie" Jefferson; that she said her husband's name was John Collins; and that Collins was never seen there. The appellant testified that after he became older his foster mother told him many times about who his parents were and that she gave him a tintype picture of his mother. A sister-in-law of appellant's mother testified that she lived in Galveston; that she knew John Hunter Collins; that she knew that a boy was born to a marriage between John Hunter Collins and "Mittie" Jefferson; and that petitioner is that boy. A Mrs. Taylor testified that she knew appellant's

mother about 1900 or 1902, in Galveston; that she knew her casually at church; that Mittie Jefferson "was supposed to have been (married to) this man Collins"; that this was "along about the year 1903 or 1904"; that she did not know Collins but knew that he worked on the water front; that she knew one child was born of this marriage although the child was a year old before she knew anything about it; and that the parties separated and the mother of the appellant, who was in poor health, left with the child. A W. J. Christian testified that he knew John Collins in Galveston from 1904 to 1907, that a part of the time both he and this Collins were foremen working on the wharves, and that he knew positively that John Collins was in Galveston "in 1905-'06-'07." This witness made no attempt to identify the John Collins he referred to with the deceased and there is a great deal of evidence that the deceased was not in Galveston, for much of the time at least, in those years.

While the appellant claims that he was born sometime during 1905, and while he claims that there is positive testimony that the deceased was then living in Galveston with his wife "Minnie" and that they did not separate until the child was born and at least a year old, a significant piece of evidence appears in a letter admittedly written by appellant's mother, which was introduced in evidence by him. This letter, dated July 14, 1905, and signed "Minnie Collins," was written to a Brother Profet. It was assumed at the trial that this was her brother, but her half brother gave a list of her brothers in which no such name appears. In this letter she says that she is "in the family way and I thought I should tell you about it I want to see you so bad just as soon as I can see you I will." She then speaks of her "truble." She then tells him not to answer the letter under two weeks because "I am in Galveston now on bisniss but soon I will be back to dickerson." Why she felt she should tell this man of her pregnancy does not appear except by possible inference, and the letter not only discloses that she was not then living in Galveston but the tone of the entire letter strongly indicates that she was not then living with a husband.

In addition to the apparent weakness in much of the evidence relied on to show that appellant's mother was the person whom the deceased married in Galveston in 1900 and lived with for two or three years thereafter, there is considerable evidence which throws more doubt on that fact. Two brothers

of the deceased testified that the deceased and his wife were living on Winnie Street in Galveston when they visited them in 1901 and 1902. Mrs. Taylor testified that the appellant's mother, when she knew her, lived on Church Street in Galveston. There was evidence that appellant's mother was a hair dresser or beauty operator and that the woman the deceased married in Galveston ran a rooming house. Two brothers of the deceased testified that the tintype picture of appellant's mother which was given to him by his foster mother was not the picture of the woman they had known as the wife of the deceased. While it may be of small value there is evidence, admitted without objection, that the deceased had told several people that he never had any children. While there is evidence that appellant's mother, who had no children other than the appellant, was pregnant in July, 1905, five brothers and sisters of the deceased testified that he came to California in the fall of 1904, and as early as September of that year, with statements as to where he was in California covering most of the time over the next two or three years. While it does not conclusively appear that he did not return to Texas for a short time during this period the evidence sufficiently justifies an inference that he did not, and that he remained in this state continuously from 1904 until his death.

The appellant testified that as he grew older his foster mother, Mrs. Nelson, told him about his father and mother, and that all he knew about them was what she told him. In obtaining a delayed birth certificate in September, 1943, he gave his mother's maiden name as "Mittie" Jefferson and stated that his father was named John Collins; that both of them lived at the time of birth in Bryan, Texas; that his father was then 24 years old; that his father was born in Calvert, Texas, and was a farmer. Two witnesses, one of them a half sister of Mrs. Nelson, swore to the truth of all of these facts and that they knew the facts at the time of birth. In addition to the discrepancy as to the place of appellant's birth it appears that the deceased had never lived in Bryan, had never been seen there, was about 29 years old in 1905; that he was born in Alabama; and that his occupation was a water front worker.

While the appellant testified that he found the letters first above mentioned in an old trunk belonging to his foster mother, a brother of the deceased testified that he saw those

letters in the possession of the deceased in 1918. Another brother testified that he saw the letters in 1938, at the time Hannah Dodson Collins separated from the deceased; that at that time the letters were removed from an old trunk which the deceased had brought with him to California in 1904, because Hannah was taking the trunk with her; that the deceased then put the letters in a letter file; that the witness saw the letters in this letter file after the deceased died; that he wanted to take them but that Diana Smallwood refused to let him have them. While Diana Smallwood denied that these letters were in the deceased's possession at the time of his death, or that she had given them to appellant, she was impeached by a showing that she had previously been convicted of a felony and further impeached by showing that she had an interest in the litigation in that she admitted that the appellant had told her that if the estate was awarded to him he would recognize her interest, she having filed a claim in the estate.

The most that can be said is that there is a conflict in the evidence. Two important questions of identity were involved, portions of the evidence are inconsistent with other parts, doubt was thrown on the credibility of much of the important testimony, the question was entirely one of fact for the trial court, and it cannot be held, as a matter of law, that the evidence does not sufficiently support the finding to the effect that the appellant was not the son of the deceased.

It is next contended that the court erred in admitting the evidence given by the collateral heirs of the deceased on the ground that these witnesses were not entitled to give their testimony, since section 195 of the Civil Code provides that the presumption of legitimacy may be disputed only by the husband or wife, or the descendant of one or both of them. The legitimacy of the appellant was in no way attacked by the respondents. The presumption referred to could have no application here until it was established that appellant's mother was once the wife of the deceased. The question here was one of identity and the evidence was properly admitted on that issue.

Finally, it is urged that the court erred in admitting in evidence, and in refusing to strike, the delayed birth certificate relating to the appellant. This certificate was admitted without objection but a motion was later made to strike it, which was denied. Although the appellant relies on this birth

certificate, in his briefs, as evidence establishing his parentage and that he was the son of the deceased, he also urges that it was improperly admitted into evidence since it is not a declaration made by a member of his family. One of the affidavits attached to the birth certificate affirming the truth of the matter set forth was made by a half sister of Mrs. Nelson, who raised the appellant after his mother's death. The appellant testified that he had many times been told the facts relating to his parentage by Mrs. Nelson, and shortly before he learned that this John Collins was dead he adopted and used for his own purposes the facts alleged in the certificate, with the accompanying evidence as to the truth of those facts. Not only was the certificate admitted without objection but since the appellant's conduct, as shown thereby, is inconsistent with his contentions in this litigation which followed, this birth certificate was admissible both as an admission made by the appellant and as tending to impeach him. While the weight to be accorded the birth certificate as evidence may be debatable, and while good arguments may be made against its probative value, the entire matter goes to the weight of this evidence and not to its admissibility.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.